**Jerry W. HILL, Appellant,**

v.

**SEXTET MINING CORPORATION; J. Landon Overfield, Administrative Law Judge; and Workers' Compensation Board, Appellees.**

**and**

**Sextet Mining Corporation, Appellant,**

v.

**Jerry W. Hill; J. Landon Overfield, Administrative Law Judge; and Workers' Compensation Board, Appellees.**

Nos. 2000–SC–1094–WC, 2000–SC–1122–WC.

Supreme Court of Kentucky.

Nov. 21, 2001.

Rehearing Denied Feb. 21, 2002.

---

**7.** Appellee's Brief at page 6.

**8.** Ky., 799 S.W.2d 10 (1990).

**9.** *Id.* at 11.

**10.** *Id.* at 12.

Randall Hardesty, Mitchell, Joiner & Hardesty, P.S.C., Madisonville, Counsel for Jerry W. Hill.

Samuel J. Bach, John C. Morton, Morton & Bach, Henderson, Counsel for Sextet Mining.

## OPINION OF THE COURT

On September 14, 1998, the claimant alleged that he was totally disabled either by injuries that occurred in 1997 and 1998, or by cumulative trauma to his neck and back from 26 years of working in low coal. An Administrative Law Judge (ALJ) subsequently determined that the low back and cervical spine conditions were substantially caused by the claimant's employment, that they resulted in total disability, and that the disability became manifest on February 11, 1998. The employer then appealed.

Noting that the claimant gave notice of specific incidents when he injured his neck but failed to notify the employer after the disabling reality of his injury became manifest, a majority of the Workers' Compensation Board (Board) reversed the finding that notice of the injury was timely and also remanded for the ALJ to consider the effect of the claimant's pre-existing spondylolisthesis on the extent to which the disability from his back injury was compensable. The Court of Appeals vacated and remanded for further findings with regard to the notice issue but adopted the Board's analysis with regard to the pre-existing condition. Both the claimant and the employer appeal.

On February 11, 1998, while attempting to twist and throw a miner cable out of some mud, the claimant felt pain across his back and "went down." He testified that he had sustained numerous incidents of trauma to his spine in the course of his work, including one on February 22, 1997. He had always been able to return to work although he did have some problems with his back over the years and had been treated by several physicians at the Trover Clinic. The record indicates that he sought treatment there on February 12, 1998, complaining of lumbosacral pain and, within days, also complaining of cervical pain. He testified that he had been unable to return to work since the incident of February 11, 1998, but that until then he was very physically active both in the course of his work and in his private life. He ran as many as 20 miles per week, played basketball with his daughters, and worked out regularly at the local YMCA. Since then, he had been unable to do exercise that affected his lower back.

The ALJ's opinion recited the course of treatment by Drs. Bowles, Coladonato, and Donnelly of the Trover Clinic, none of whom attributed an impairment rating to the February 11, 1998 incident or to the claimant's employment. Although some of

the treating physicians thought that the claimant should not continue to work in mining and told him so at various times when he sought treatment, there is no indication that any attributed the development of the degenerative condition, itself, to his work.

The opinion also recited the results of a March, 1999, evaluation by Dr. Laughlin, who testified on behalf of the employer and attributed no harmful change to the 1997 or 1998 incidents. Although admitting that coal mining does tend to accelerate the degenerative process, causing the development of degenerative disc disease and spinal stenosis, Dr. Laughlin attributed the claimant's degenerative problems to the natural aging process.

In concluding that the claimant sustained a gradual injury, the ALJ chose to rely upon an independent medical evaluation that was conducted by Dr. Gaw. Dr. Gaw examined the claimant on August 13, 1998, and reviewed the MRIs, x-rays, and notes of Drs. Bowles and Coladonato. Among other conditions, he diagnosed degenerative cervical and lumbar disc disease and grade 1 or 2 spondylolisthesis at L5 with left radiculopathy. He testified that the degenerative condition was present as early as 1992 but that because the claimant always returned to an asymptomatic state after periodic flare-ups, had missed work for no more than a few weeks in the past 7–8 years, and was able to run long distances, he did not consider the condition to be active or disabling until after the February 11, 1998, incident. In his opinion, the repetitive insults to the claimant's neck and back from his work as a coal miner had caused a cumulative trauma injury to his spine, aggravating and accelerating both his degenerative problems and the spondylolisthesis.

Dr. Gaw indicated that the spondylolisthesis was the claimant's "biggest problem" and that it had existed as early as 1995.[1] As a preventative measure, he would have recommended at that time that the claimant not lift more than 40–50 pounds and would have advised him to do work that allowed him to change positions frequently. Noting that the claimant was working and active up until February, 1998, Dr. Gaw viewed the previous episodes of back pain as being no more than temporary exacerbations of symptoms of the ongoing spondylolisthesis and degenerative disc disease, and he characterized the conditions as being dormant and nondisabling before that time. Whereas, after February, 1998, the conditions were active and disabling.

Using the DRE model, Dr. Gaw assigned a 5% AMA impairment for the cervical condition and a 25% impairment for the lumbar condition, resulting in a combined impairment of 29% under the combined values table. When asked how he had derived the lumbar impairment, he explained that he had assigned 7% for spondylolisthesis, 14% for loss of range of motion, and 5% for radiculopathy and that the ratings combined to yield a 25% impairment. On cross-examination, he testified that grade 2 spondylolisthesis, by itself, would warrant a 5–20% impairment rating but that no one had actually performed the flexion/extension x-rays that were necessary in order to determine the appropriate rating for that condition.

■ As amended effective December 12, 1996, KRS 342.0011(1) defines a compensa-

---

1. Spondylolisthesis is the forward movement of the body of one of the lower lumbar vertebrae on the vertebra below it or on the sacrum.

ble injury as being a traumatic event or series of events, including cumulative trauma, that proximately causes a harmful change in the human organism. Although the claimant notified the employer of at least some of the instances in which he bumped his head, it was not until he filed his claim on September 14, 1998, that he informed the employer of the alternative claim for a gradual injury. Notice of a work-related injury may be given in the context of filing a claim, but such notice may or may not be timely, depending on the circumstances. *See Smith v. Cardinal Construction Co.,* 13 S.W.3d 623 (2000); *Peabody Coal Co. v. Powell,* Ky., 351 S.W.2d 172 (1961). Here, the ALJ relied upon Dr. Gaw's testimony, determined that the claimant sustained a gradual injury to his cervical and lumbar spine from the whole of his employment as a coal miner, pointed to the notice of specific instances of trauma, and determined that the claimant gave timely notice of the gradual injury.

■ Implicit in the finding of a gradual injury was a finding that no one instance of workplace trauma, including those specifically alleged and those of which the employer was notified, caused an injury of appreciable proportion. Instead, the ALJ concluded that the harmful change that gave rise to the claimant's permanent disability occurred gradually and resulted, at least to a significant extent, from the effect of work-related wear and tear during the course of his coal mine employment. Medical causation is a matter for the medical experts and, therefore, the claimant cannot be expected to have self-diagnosed the cause of the harmful change to his cervical spine as being a gradual injury versus a specific traumatic event. He was not required to give notice that he had sustained

a work-related gradual injury to his spine until he was informed of that fact. *See Alcan Foil Products v. Huff,* Ky., 2 S.W.3d 96 (1999); *Special Fund v. Clark,* Ky., 998 S.W.2d 487 (1999).

■ It is clear that the claimant was aware of symptoms in his cervical spine and associated the periodic flare-up of symptoms with his work long before being evaluated by Dr. Gaw, and he also sought medical treatment after some specific incidents of cervical trauma. Furthermore, it is clear that the physicians who treated the claimant's symptoms over the years had encouraged him to quit working in the mines and had told him that the work was too stressful. Nonetheless, there is no indication that any of them ever informed him of his work-related gradual injury, i.e., that his work was gradually causing harmful changes to his spine that were permanent. Under those circumstances, we are not persuaded that the claimant was required to self-diagnose the cause of the cervical pain that contributed to his inability to work after February 11, 1998, as being such an injury. On August 13, 1998, Dr. Gaw became the first physician to determine that the claimant's work over the years had accelerated the development of the degenerative condition in his cervical and lumbar spine and had aroused the preexisting spondylolisthesis into disabling reality. This was the first time that a physician had diagnosed a gradual work-related injury. It is not clear whether the claimant was informed of that fact on the date of the exam or later, but he notified the employer of the gradual injury when his claim was filed one month later. We conclude, therefore, that substantial evidence supported the finding that the claimant gave timely notice of the gradual injury to his cervical spine. For that reason

and although the ALJ's reasoning was different from our own, the finding should not have been reversed on appeal.

The employer has asserted that the impairment due to the preexisting spondylolisthesis should have been excluded when the ALJ determined that the claimant was totally disabled, pointing out that KRS 342.730(1) explicitly forbids a consideration of nonwork-related impairment when determining whether a worker is totally disabled. It emphasizes that uncontradicted medical evidence established that the condition accounted for a significant functional impairment before February 11, 1998, and that even Dr. Gaw conceded that the condition was not work-related and that it had not progressed since 1992. The employer concludes, therefore, that the claim must be remanded so that the degree of impairment that existed prior to the compensable injury can be excluded from the award. We disagree.

KRS 342.730(1)(a) provides, in pertinent part, as follows:

> Nonwork-related impairment and conditions compensable under KRS 342.732 and hearing loss covered in KRS 342.7305 shall not be considered in determining whether the employee is totally disabled for the purposes of this section.

As effective December 12, 1996, KRS 342.0011(11)(c) indicates that a finding of total disability requires a permanent disability rating and a complete inability to work as a result of an injury. KRS 342.0011(36) indicates that in order to have a permanent disability rating, a worker must have an AMA impairment. Although permanent partial disability is now measured in terms of a worker's impairment and the appropriate statutory factor, in *Ira*

*A. Watson Dept. Store v. Hamilton*, Ky., 34 S.W.3d 48 (2000), we determined that KRS 342.0011(11)(c) and KRS 342.730(1)(a) permit a consideration of some of the factors that were set forth in *Osborne v. Johnson*, Ky., 432 S.W.2d 800 (1968), as well as the worker's AMA impairment when determining whether the worker is totally disabled. Long ago, we determined that to the extent that a dormant degenerative condition, itself, is proximately caused by work, the condition is an injury. *See Haycraft v. Corhart Refractories*, Ky., 544 S.W.2d 222, 225 (1976). That principle remains viable under the 1996 amendments. Furthermore, after the Court of Appeals decided the instant case, we determined that although the Special Fund no longer is a party in workers' compensation claims, disability that results from the arousal of a prior dormant condition by a work-related injury remains compensable under the 1996 Act. *McNutt Construction/First General Services v. Scott*, Ky., 40 S.W.3d 854, 859 (2001).

■ We conclude that in order for a worker to receive income benefits for a work-related harmful change under KRS 342.730(1)(a), the harmful change must warrant an AMA impairment, and the worker must have a complete and permanent inability to work due to one or more work-related harmful changes other than coal workers' pneumoconiosis or hearing loss. Furthermore, a worker who has sustained both compensable and noncompensable disability is entitled to receive income benefits for the full extent to which compensable, work-related harmful change causes a complete inability to work. *See International Harvester Co. v. Poff*, Ky., 331 S.W.2d 712 (1959). Therefore, a worker with an AMA impairment from a nonwork-related condition who sustains a work-related injury may receive income

benefits for total disability if there is substantial evidence that the work-related harmful change, by itself, is sufficient to cause an AMA impairment and to cause the worker to be unable to perform any work.

■ In the instant case, Dr. Gaw testified that the wear and tear of the claimant's work accelerated the development of his degenerative disc disease and caused it to become disabling. He also indicated that it aroused the pre-existing spondylolisthesis into disabling reality, specifically pointing to the left leg pain that was caused by a pinched or irritated nerve and that began after February 11, 1998. He assigned a combined AMA impairment of 29%. The ALJ determined that the claimant sustained a gradual, work-related injury and did not have a pre-existing active occupational disability. Although recognizing that a finding of active disability is not precluded simply because an individual continues to work, the ALJ pointed out that the claimant was performing arduous manual labor in underground mining on a regular basis, that he often ran 20 miles per week, and that less than a year before his gradual injury became manifest he had run in a 7 mile competitive race. Furthermore, ALJ pointed to Dr. Gaw's testimony that although the claimant had several flare-ups of back pain between 1992 and 1998, he had returned to an asymptomatic state in short order. The ALJ concluded, therefore, that neither the spondylolisthesis nor a 1987 knee injury caused an ongoing, active disability and that the claimant was entitled to income benefits for total disability.

Having reviewed the evidence and the ALJ's findings, we are persuaded that there is no indication that nonwork-related impairment was considered when the ALJ determined that the claimant was totally disabled and entitled to an award under KRS 342.730(1)(a). Furthermore, although the decision was made without the benefit of our subsequent interpretations of the 1996 Act, there was substantial evidence that work-related harmful changes, by themselves, were sufficient to cause an AMA impairment and to render the claimant unable to perform any work. Under those circumstances, the ALJ's refusal to exclude prior, active disability on these facts should not have been disturbed on appeal.

The decision of the Court of Appeals is hereby reversed, and the decision of the ALJ is reinstated.

All concur.